**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KELLY CARTER,**

     **Petitioner,**                    **CASE NO. 2:10-CV-199**
                                          **JUDGE WATSON**
**v.**                                   **MAGISTRATE JUDGE ABEL**

**WARDEN, ROSS CORRECTIONAL
INSTITUTION,**

     **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner Kelly Carter, a state prisoner, brings this action for a writ of habeas corpus under 28 U.S.C. 2254. This matter is before the Magistrate Judge on the petition, Respondent's return of writ, Petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## SUMMARY OF ISSUES

Kelly Carter was convicted by a jury in the Court of Common Pleas for Jefferson County, Ohio of aggravated murder, complicity to commit aggravated murder, murder and complicity to commit murder, two counts of felonious assault, complicity to commit felonious assault, and related firearms specifications. On February 9, 2005, Carter was sentenced to an aggregate sentence of life imprisonment.

Carter's habeas corpus petition pleads these convictions were unconstitutionally obtained because the prosecution failed to disclose an agreement to dismiss state felony charges in return for the sole eyewitness's testimony and the trial judge prevented cross-examination of that witness about his criminal convictions and pending state charges. It further alleges that Carter was denied a fair trial when the prosecutor presented evidence that a co-defendant bribed a witness, jurors

discussed and considered information outside the trial record, and the prosecutor engaged in pervasive misconduct. Finally, it alleges that Carter was denied the effective assistance of counsel. That claim includes the assertion that Carter's trial counsel had a conflict of interest because he represented both Carter and his co-defendant Robinson. Concluding that the state court findings of fact regarding these claims are binding on this federal habeas corpus court and that the state court resolutions of these claims was not contrary to or an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d) and (e), the Magistrate Judge recommends that the petition be denied.

## FACTS and PROCEDURAL HISTORY

The Ohio Seventh District Court of Appeals summarized the facts and procedural history of this case as follows:

> On August 5, 2001, Xuan Sayles broke into the apartment of Shane Robinson, beat Robinson's stepfather, Vernon Thurman, shot Robinson's brother, Shiraz, and robbed the apartment. Xuan Sayles is a cousin of Terrell Sayles and Wade. Robinson was upset about the robbery and the assault on his brother and he and his friend, Carter, believed that Terrell Sayles and Wade either had something to do with the robbery or had some form of control over Xuan. During the course of the month of August 2001, many people witnessed a rising in tensions between these two groups and on many occasions, Robinson and Carter stated that they wanted both to be repaid for what they lost in the robbery and revenge for the shooting of Robinson's brother.
>
> On August 27, 2001, Robinson and Carter were at a bar in Steubenville, Ohio, the Safari Lounge, with a group of their friends. Wade was also at the Safari Lounge with a group of his friends. At one point during the evening, Carter was overheard saying that he would like to kill everybody in Wade's group of friends. Robinson and Carter left the Safari Lounge before Wade and a mutual friend warned Wade that he had a feeling that Carter and Robinson may do something bad that night. When Wade drove home in the early hours of August 28, 2001, he was met by Carter and Robinson. He got into

an altercation with them and they shot him multiple times. Wade was dead by the time emergency medical personnel responded to the scene.

There were three eyewitnesses to the shooting, Demetrius Birden, a cousin of Wade's who was later murdered in an unrelated incident, Carl Williams, and Tina, an unidentified Caucasian girl. Williams, a convicted felon who was testifying in an attempt to cooperate with federal authorities, testified that he saw the entire altercation in front of Wade's home.

Carter was indicted for the murder of Wade on June 3, 2004. The indictment charged Carter with aggravated murder, complicity to aggravated murder, murder, complicity to murder, and two counts of felonious assault and complicity to felonious assault. Each of these charges also contained a firearm specification. The indictment was later amended on July 19, 2004. The same charges were filed against Robinson. Carter and Robinson retained the same counsel to represent them against these charges.

On January 12, 2005, the State made a plea offer to Carter. That offer proposed that Carter plead guilty to one count of felonious assault in exchange for testifying against Robinson. At two separate hearings, the trial court urged Carter to obtain the services of separate counsel to advise him on whether to accept this plea since his current counsel represented both he and Robinson. The trial court offered to appoint separate counsel to Carter for this purpose. Carter turned down the offer of separate counsel, refused to discuss the matter with new counsel, and rejected the State's plea offer.

The matter proceeded to a jury trial on February 1, 2005. During that trial, defense counsel's main strategy was to discredit the testimony of the State's only eyewitness, Williams, by using witnesses who testified that he was not in Steubenville on the date in question. In rebuttal, the State called a witness who testified that Robinson bribed one of the defense witnesses who testified that Williams was in Chicago during August 2001, not Steubenville. After deliberation, the jury found Carter guilty of all counts. The trial court then sentenced Carter to twenty-three years to life.

*State v. Carter,* 2007 WL 1976666, at *1-2 (Ohio App. 7th Dist. June 29, 2007). Petitioner filed a timely appeal in which he raised the following assignments of error:

1.  The trial court erred when it failed to declare a mistrial after the impartiality of the jury was compromised when jurors discussed and considered information outside the record in violation of the Appellant's Fifth Amendment right to be tried and convicted only on the evidence presented at trial and of record and his Sixth Amendment right to an impartial jury.

2.  The prosecutor's pervasive misconduct during the course of the Appellant's entire trial denied the Appellant his right to a fair trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution and merits a reversal of Appellant's convictions and a new trial.

3.  The Appellant was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution due to trial counsel's conflict of interest in representing the Appellant and his codefendant at trial; his failure to seek severance of the defendants; his failure to object to other acts evidence, hearsay evidence, and the prosecutor's improper closing argument.

4.  The Appellant was denied his right to confront the witnesses against him under the Sixth Amendment of the United States Constitution and Article I Section 10 of the Ohio Constitution.

5.  The trial court denied Appellant his rights to a fair trial and due process of law by permitting witness testimony that did not conform to Evid.R. 401, 403, and 404(B).

6.  The Appellant's convictions for aggravated murder and complicity to aggravated murder are against the manifest weight of the evidence and without sufficient evidence as a matter of law.

7.  The cumulative effect of errors deprived the Appellant of his right to a fair trial under both the Ohio and United States Constitutions.

*See id.* On June 29, 2007, the appellate court affirmed the judgment of the trial court. *Id.* On

December 12, 2007, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v.*

*Carter,* 116 Ohio St.3d 1438 (2007).

Petitioner also pursued post conviction relief. After a hearing, on April 27, 2007, the trial

court denied Petitioner's post conviction petition. *See Exhibits 13, 14 to Return of Writ*. Petitioner

filed a timely appeal, in which he asserted as follows:

> 1. THE TRIAL COURT ERRED BY DENYING THE APPEL-
> LANTS CLAIM THAT THE STATE FAILED TO DISCLOSE AN
> AGREEMENT WITH THE SOLE EYEWITNESS CONCERNING
> HIS PENDING INDICTMENT IN JEFFERSON COUNTY COM-
> MON PLEAS COURT CASE NO. 02CR175 AND HIS
> COOPERATION AND TESTIMONY AT TRIAL, MAKING THE
> APPELLANT'S CONVICTIONS VOID AND/OR VOIDABLE
> VIOLATING HIS SIXTH, FIFTH AND FOURTEENTH AMEND-
> MENT RIGHTS GUARANTEED BY THE UNITED STATES
> CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO
> CONSTITUTION.
>
> 2. THE TRIAL COURT ERRED BY DENYING THE APPEL-
> LANT'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL
> AS GUARANTEED BY THE SIXTH AND FOURTEENTH
> AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE
> I SECTION 10 OF THE OHIO CONSTITUTION.

*State v. Carter*, 2008 WL 5228925, at 2 (Ohio App. 7th Dist. Dec. 15, 2008). On December 15,

2008, the appellate court affirmed the trial court's judgment. *Id.* On June 3, 2009, the Ohio

Supreme Court dismissed Petitioner's subsequent appeal. *Exhibit 24 to Return of Writ*.

On March 5, 2010, through counsel, Petitioner filed the instant petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in

violation of the Constitution of the United States based upon the following grounds:

> 1. The state failed to disclose to the petitioner the agreement it
> reached with its critical eyewitness to not proceed on a pending
> indictment against the witness in exchange for his cooperation and
> testimony at trial against the petitioner.
>
> 2. The trial court refused to allow petitioner to cross examine the
> state's eyewitness about his pending federal and state drug charges
> and his agreement with federal prosecutors.
>
> 3. The petitioner was denied his right to a fair trial when the

prosecutor presented evidence of the petitioner's co-defendant's supposed efforts to bribe witnesses thereby resorting to the thoroughly discredited doctrine of guilt because of the petitioner's association with the co-defendant.

4. The petitioner was denied effective assistance of counsel in violation of his rights under the United States Constitution.

5. The petitioner was denied a fair trial when the impartiality of the jury was compromised after jurors discussed and considered information outside of the trial record.

6. The pervasive misconduct of the trial prosecutor during the course of petitioner's trial denied him a fair trial.

It is the position of the Respondent that Petitioner's claims are without merit.

## CLAIM ONE

In claim one, Petitioner asserts that he was denied a fair trial because the State improperly failed to disclose its agreement with prosecution witness Carl Williams not to pursue pending State drug charges against Williams in exchange for his testimony against Petitioner. Williams denied, at trial, being made any promise in exchange for his testimony against Petitioner. *Trial Transcript*, at 966-967. The state appellate court affirmed the trial court's conclusion, made after a hearing, that no agreement existed between Williams and State prosecutors, reasoning as follows:

> Appellants argue that the trial court should have granted their post-conviction petitions because the state erred in failing to disclose an alleged agreement with witness, Carl Williams, to drop charges against him in exchange for his testimony against appellants.
>
> Williams was the state's key witness in appellants' trial who testified that he saw appellants shoot the victim, Alfred Wade, Jr. It was disclosed that Williams was testifying in exchange for leniency in a federal case in Chicago. On March 23, 2007, well after appellants' trial, the prosecutor filed a request to nolle prosequi a pending state drug case against Williams. Appellants argue that the fact that the prosecutor moved to nolle prosequi the charges against Williams is evidence that an agreement existed between Williams and the state

whereby the state would dismiss the charges against Williams in exchange for his testimony against appellants.

In support of their contention that the state had a deal with Williams to testify against them in exchange for the state dropping the drug charges against him, appellants point to the following evidence.

First, they point to the request to nolle prosequi Williams' drug case. (Def.Ex.E). In the request, the prosecutor specifically states: "The undersigned is advised, further, that in the event this defendant testified favorably in the above described homicide cases, and that he pleaded guilty in Case # 02CR1092, then pending in the United State District Court, for the Northern District of Illinois, and was sentenced to a term of imprisonment therein, that the State of Ohio would move for a Nolle Prosequi of the case herein."

Second, appellants point to Prosecutor Thomas Straus's testimony. Straus assumed office in January 2005. Because he was not familiar with appellants' case, the court appointed Rich Ferro, the prosecutor who had been handling the matter, as special prosecutor for the case, which proceeded in February. Thus, Straus was not involved in any deal that may or may not have been made. Appellants' note that Straus testified that the information he put in the request to nolle prosequi Williams' drug case came from "Somebody," possibly Ferro and one of the detectives on the case. (Tr. 101).

Third, appellants point to the testimony of Detective Jason Hanlin. Detective Hanlin testified that Williams admitted his role in the drug case against him. (Tr. 146). Appellants argue that this was relevant because Straus indicated that one of the reasons for his request to nolle prosequi Williams' case was because there was no evidence on which to proceed.

Fourth, appellants argue that when Williams testified in their trial he had an outstanding warrant for his arrest in the drug case. Yet the warrant was not executed at that time. Appellants contend that this demonstrated that a deal was in place between Williams and the state.

Finally, appellants point to a letter from Ferro to the federal judge in Williams' case expressing the state's gratitude to Williams for testifying in appellants' trial.

Appellate review of a trial court's disposition of a petition for postconviction relief is a hybrid presenting mixed questions of law

and fact. *State v. Smith* (Sept. 24, 1999), 11th Dist. No. 98-T-0097; *State v. Akers* (Sept. 9, 1999), 4th Dist. No. 98 CA 33. The trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. Judgments will not be reversed, as being against the manifest weight of the evidence if they are supported by some competent, credible evidence. *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533; C.E. *Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. Upon accepting such findings of fact, an appellate court then independently determines the propriety of the trial court's conclusions of law.

In this case, the trial court found that at appellants' trial, Williams denied the existence of any agreement with the state. It further found that appellants failed to produce any credible evidence that there was a plea agreement with the state. It found that there was a plea agreement between Williams and the federal government but that this agreement was disclosed in discovery. Finally, the court found that no agreement existed between Williams and the state.

The trial court's determination that no agreement existed between Williams and the state is not against the manifest weight of the evidence. In addition to the evidence detailed by appellants above, the following evidence was also presented.

Straus testified that when he filed the request to nolle prosequi Williams' drug case, his facts were not completely accurate. (Tr. 95). He stated that he misspoke in his request because he had not fully digested what had occurred in this case. (Tr. 102). Straus testified that once he had reviewed all of the information in this case, it became obvious to him that Williams did not have an agreement with the state. (Tr. 103). He gave the following narrative of events.

Williams was one of four defendants in what was known as the "Greyhound bus" drug case. (Tr. 95). Williams, along with co-defendants, Logan, Vance, and Lofton, were all indicted on the same charges. (Tr. 95-96). Lofton and Logan both entered pleas and received probation. (Tr. 96). The prosecutor then dismissed the charges against Vance. (Tr. 96). These three men then left the area and the former prosecutor did nothing to secure their testimony. (Tr. 96-97). Without the testimony of at least one of the co-defendants, the state could not prosecute Williams successfully. (Tr. 97).

Straus stated that he was confused about the state of the Williams

drug case and how it related to Williams' federal charges. (Tr. 97). After he filed his request to nolle prosequi Williams' drug charges, he spoke with Ferro. (Tr. 97). He then located a note from Ferro to an assistant prosecutor wherein Ferro advised her that Williams' charges were included in a federal charge as part of the federal agreement. (Tr. 97). Straus stated that when he filed the request to nolle prosequi, he was unsure whether Williams actually got a recommendation for dismissal because he had cooperated in appellants' cases or whether Ferro had been satisfied that the issues raised in Williams' drug case were being adequately handled in the federal case. (Tr. 98).

Since that time, Straus stated that he reviewed Williams' federal plea agreement. (Tr. 98). He pointed out that the agreement specifically references Williams' Ohio drug offense. (Tr. 98; Def. Ex. A). Straus stated that he believed that Ferro was satisfied that Williams' drug case should be dismissed because it was addressed in his federal case. (Tr. 98). Straus testified that he believed that Ferro was satisfied that if Williams testified truthfully in appellants' trial and if Williams' state drug case was wrapped up in his federal case, then Ferro would no longer pursue the drug charges against Williams because Williams would be adequately punished. (Tr. 100).

Straus further stated that in addition to this reason, his other reason for requesting to nolle prosequi the drug case was that after reviewing it with the Steubenville police, he concluded that the evidence did not exist to successfully prosecute the case. (Tr. 99).

Additionally, Detective Jonathan Sowers testified that he had discussed this matter with Straus and conveyed to him that there was no case against Williams to prosecute. (Tr. 126-27, 141). Detective Sowers also testified that in a conversation with Williams, Williams told him that his state drug charges were being handled as part of his federal plea deal. (Tr. 129-30).

This evidence supports the trial court's finding that Williams did not have a deal with the state. This matter turned on Straus's credibility. Determinations of witness credibility are primarily for the trier of the facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. This is because the trier of the facts is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of their testimony. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, at ¶ 11.

Straus's testimony, if believed, demonstrates that no deal existed between Williams and the state. Appellants' strongest argument in support of an alleged deal is the request to nolle prosequi the drug charges against Williams wherein Straus stated that the reason for the motion was that Williams testified favorably in appellants' trial. However, Straus explained himself and this misstatement in his testimony at the post-conviction hearing. He then put his statement on the record that the reason for requesting the nolle prosequi was not because of a deal with Williams in exchange for his testimony, but instead was two part: (1) Williams was already sentenced in federal court, which took into account his drug activity in Ohio; and (2) there was not sufficient evidence on which to prosecute Williams. The trial court believed Straus's explanation.

Because the trial's court's findings were not against the weight of the evidence, the court properly denied appellants' post-conviction petitions as to this issue. Accordingly, appellants' first assignments of error are without merit.

*State v. Carter*, 2008 WL 5228925, at *3-5.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Court of Appeals for the Sixth Circuit has summarized this standard as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case.

*Boykin v. Webb,* 541 F.3d 638, 642 (6th Cir.2008) (quoting *Williams v. Taylor,* 529 U.S. 362

(2000)).  Petitioner has failed to meet this standard here.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 86. Evidence is material

[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*United States v. Bagley*, 473 U.S. 667, 682 (1985).

[T]here is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler v. Greene,* 527 U.S. 263, 281 (1999); *see also United States v. Jones*, 766 F.2d 994, 998

n. 1 (6th Cir.1985) ("In the absence of prejudice, even assuming a violation of Brady, reversal is not

required.")(citing *United States v. Campagnuolo*, 592 F.2d 852, 861 & n. 9 (5th Cir.1979)).

"Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir.1996)(citing *Bagley*).

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court reversed convictions of a defendant where a crucial prosecuting witness falsely denied being made a promise by the prosecutor in return for his trial testimony. The Supreme Court held that, where a witness' credibility is "an important issue in the case . . . evidence of any understanding or agreement as to future prosecution" is relevant to his credibility and the jury is entitled to know that information. *Id.*, at 154-155. Even a "less formal, unwritten or tacit agreement" constitutes possible impeachment material that must be turned over to the defendant under *Brady. Hanna v. Ishee*, 2009 WL 485487 (S.D. Ohio February 26, 2009).

> The prosecution's giving a witness benefits -- leniency, cash, or anything else -- can be used by a cross-examining defense counsel to undermine the witness in two . . . distinct ways. The first and most common is by showing that the benefits were given in return for the witness's providing testimony that would help the prosecution. He might have told the prosecutor what he would testify to if called and the prosecutor might have explicitly agreed to give him specified benefits if he testified consistently with his proffer. Or there might have been a tacit understanding that if his testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge . . . . Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense.

*Joseph v. Coyle,* 469 F.3d 441, 470 (6th Cir. 2006), citing *Wisehart v. Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005) (citations omitted).

> *Brady* is not limited to formal plea bargains, immunity deals or other notarized commitments. It applies to 'less formal, unwritten, or tacit agreement[s],' so long as the prosecution offers the witness a benefit in exchange for his cooperation, ... so long in other words as the

evidence is 'favorable to the accused.' " *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir.2009) (quoting *Bell*, 512 F.3d [223,] 233 [6th Cir. 2008] and *Bagley*, 473 U.S. at 678).

*Akrawi v. Booker*, 572 F.3d 252, 262 (6th Cir. 2009). Additionally, the government has an obligation to correct testimony it knows to be false denying the existence of any such agreement.

*Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959)(citations omitted).

> The principle that a State may not knowingly use . . . false testimony to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in ... *People v. Savvides*, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854-855:
>
>> 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.'

*Id.,* at 269-270.

> A false-testimony claim is cognizable in habeas because the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Abdus-Samad v. Bell*, 420 F.3d 614, 625 (6th Cir. 2005) (quoting *Giglio,* 405 U.S. 150). To prevail on such a claim, [petitioner] must show "(1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Id.* at 625-26. The subject statement must be "indisputably false" rather than "merely misleading." *Id.* at 626 (quoting *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000)).

*Akrawi v. Booker,* 572 F.3d at 265.

That said, "[a] witness's expectation of a future benefit is not determinative of the question of whether a tacit agreement subject to disclosure existed." *Bell v. Bell,* 512 F.3d 223, 233 (6th Cir. 2008), citing *Wisehart v. Davis, supra.* Further,

> it is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady.* "The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony." *Shabazz v. Artuz,* 336 F.3d 154, 165 (2d Cir. 2003) (emphasis in original). To conclude otherwise would place prosecutors in the untenable position of being obligated to disclose information prior to trial that may not be available to them or to forgo the award of favorable treatment to a participating witness for fear that they will be accused of withholding evidence of an agreement.

*Bell,* 512 F.3d at 234; *see also Akrawi v. Booker.*

Petitioner contends that the state courts unreasonably concluded no agreement existed between state prosecutors and Williams. He argues that the testimony of prosecuting attorney, Thomas Straus, indicating State prosecutors requested dismissal of charges against Williams due to insufficient evidence and because Williams had been adequately punished by his conviction in federal court is speculative and unworthy of credit, since neither the trial prosecutor nor the investigating detective testified at post conviction proceedings, in view of the language set forth in the prosecutor's motion to dismiss,[1] and because, according to Detective Hanlin, Williams had

---

[1] The *Request to enter Nolle Prosequi* indicates in relevant part:

[T]he undersigned is advised that former Assistant Prosecuting Attorney Richard Ferro. . . determined that the testimony of Carol J. Williams, the defendant herein, was necessary in the prosecution and conviction of two homicide cases. . . .

confessed.  Petitioner refers to the letter of leniency written by Richard Ferro, the trial prosecutor, to the federal court after Williams' testified against Petitioner, *Traverse, Attachment 2,* Williams' agreement to testify against petitioner without the benefit of counsel, Williams' plea agreement with federal authorities,[2] and the prosecutor's failure to take action on pending State charges until after completion of Petitioner's trial, all in support of his claim.  *See Traverse*.  Finally, Petitioner notes that Williams faced a potentially lengthy sentence and anticipated that sentence would be reduced in exchange for his testimony against Petitioner.  Petitioner complains that Williams' testimony regarding the use of two guns contradicts forensic evidence indicating use of a single firearm.  *Id.*

In order to obtain habeas corpus relief, Petitioner must establish by clear and convincing evidence that the state court's factual findings are unreasonable or incorrect, or that the state appellate court's decision is contrary to or constitutes an unreasonable  determination of the facts

---

The undersigned is advised that the defendant herein testified favorably for the prosecution in said homicide cases, which testimony assisted in the successful prosecution and conviction of both defendants in the said cases.

The undersigned is advised, further, that in the event this defendant testified favorably in the above described homicide cases, and that he pleaded guilty in Case #02CR1092, then pending in the United States District Court for the Northern District of Illinois, and was sentenced to a term of imprisonment therein, that the State of Ohio would move for a Nolle Prosequi of the case herein.

*Traverse, Attachment 1.*

[2]  Petitioner's plea agreement with the United States Attorney for the Northern District of Illinois indicates in relevant part that the agreement involves solely the federal criminal charges pending against him and "cannot bind any other. . . state or local prosecuting. . . authorities." *Plea Agreement, Traverse, Attachment 3.*  The plea agreement indicates that Petitioner "agrees to provide complete and truthful information in any investigation. . . and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, any criminal proceeding in the Circuit Court of Cook County, and any criminal proceeding in the courts of Ohio[.]"

in light of the evidence presented. 28 U.S.C. § 2254(d), (e). Upon review of the record, the Magistrate Judge finds that Petitioner has not met this burden here. As discussed by the state appellate court, Thomas Straus assumed office as the prosecuting attorney in January 2005. *Transcript, Post Conviction Petition*, at 94. Rich Ferro, was appointed as a special prosecutor to handle Williams' case. *Id*. At the evidentiary hearing on Petitioner's petition for post conviction relief, Straus testified repeatedly that his motion requesting dismissal of the charges against Williams was inaccurate. *Id*.; 111 Straus had been "totally confused" about what Ferro was doing in Petitioner's case or the prosecution of drug charges involving Williams and three co-defendants. *Id*. at 101. When Straus took office, "[t]he office was a mess." *Id*. "So, we made an effort to try and scramble, not to compromise on any cases but also to do whatever was correct in each particular file. So, I believe I misspoke [in the motion to dismiss] and that's the reason for my testimony today. *Id*. at 102. After reviewing the case and speaking with special prosecutor Ferro, this being after Straus had already filed the motion for dismissal of the charges against Williams, Straus learned no agreement existed between the State and Williams. "[I]t was Rich Ferro's position that as long as [Williams'] case was resolved to Ferro's satisfaction in the federal case, that [Williams] was somehow punished for the drug activity here in Steubenville in the federal case, then [Ferro] was willing to dismiss it." *Id*. at 102-105. Further, the co-defendants involved in Williams' case, although all facing potentially lengthy sentences, had received either probation, or dismissal of the charges against them. Therefore, dismissal of the drug charges against Williams, in view of his federal sentence, was not unusual, despite Williams' having faced a potentially lengthy sentence. *Id*. at 106. Straus stated, "I am now satisfied. . . there was no deal." *Id*. at 107. The prosecution had made no effort to execute the warrant against Williams because the whereabouts of his co-

defendants were unknown and there was no evidence against Williams. *Id*. at 108. "It's not worth our. . . expense to find them and extradite them for this." *Id.* at 112.

As discussed, Williams expectation that he would benefit from testifying against Petitioner is not determinative to a finding of whether an agreement existed, nor was the prosecutor's subsequent decision to file a motion to dismiss the charges against Petitioner, or request leniency for him in his federal case. Petitioner has failed to establish that habeas corpus relief is warranted.

Claim one is without merit.

## CLAIM TWO

In claim two, Petitioner asserts that he was denied his right to confront the witnesses against him because the trial court refused to permit him to cross examine Carl Williams regarding Williams' pending State and federal charges or his alleged agreement with federal prosecutors whereby his sentence would be substantially reduced if he testified against Petitioner.

Pursuant to the terms of Williams' guilty plea with the federal government, Williams' pleaded guilty to conspiracy to possess with intent to distribute in excess of 50 grams of cocaine base, and the government agreed to dismiss a second count involving the same charge. Williams thereby obtained a two-level reduction in his recommended sentence under the United States Sentencing Guidelines for his acceptance of responsibility. Williams agreed "to provide complete and truthful information" if called to testify in any federal or state court proceeding. Sentencing in Williams' federal case was postponed until after the conclusion of the prosecution of cases in which he was providing assistance to governmental authorities. *See Federal Plea Agreement,* Doc. 19. The government would make known to the sentencing judge the extent of Williams' cooperation and

move for a downward departure from the sentencing guidelines, assuming Williams fully and truthfully cooperated with police, pursuant to §5K1.1. *See id.*

The state appellate court–finding that the trial judge had not prevented defense counsel from questioning Williams about his criminal record–rejected Petitioner's claim that he had been convicted in violation of the Confrontation Clause:

> Carter contends that he was deprived of his right to cross-examine the witnesses against him in three ways: 1) by limiting the defense's ability to cross-examine the State's only eye witness, Carl Williams, about his criminal history[.]
>
> Cross-Examination of Williams
>
> Carter's defense at trial was to attack the credibility of the State's only eye witness, Williams. He claims the trial court wrongfully prevented him from presenting this defense in full by limiting Carter's ability to inquire into Williams' criminal history. Carter complains of three specific instances when the trial court sustained an objection, which limited his ability to cross-examine Williams on certain subjects. In the first instance, defense counsel was asking Williams about various identities he had used in the past. Williams explained that he had more than one identity because he was "involved in a fraud conspiracy." Counsel then asked Williams, "Tell me about that," to which the prosecutor objected. The trial court sustained the objection and explained at a sidebar that defense counsel could inquire into Williams' convictions, but not the background of those convictions. Defense counsel then began questioning Williams on a different subject.
>
> In the second instance, defense counsel was cross-examining Williams about the specifics of what he allegedly saw at the scene and comparing these statements to Williams' prior statements to police. After Williams responded that he may have to have his memory refreshed, counsel asked, "How about 900 grams of marijuana and 220 grams of cocaine?" The prosecutor objected, the trial court sustained the objection, and the parties then had a sidebar. At the sidebar, the prosecutor stated that Williams had not been convicted for anything regarding those drugs and the trial court stated that he wanted "no further discussion" of those issues and, "We're done with that kind of stuff." Defense counsel then began questioning

Williams on other topics.

In the final instance which Carter cites, defense counsel was asking Williams about how long Williams had been cooperating with federal authorities during recross-examination. The prosecutor objected to these questions and the trial court excused the jury for lunch without ruling on the objection. At a sidebar, the trial court indicated that the parties held an unrecorded conference at which they discussed the objection and instructed counsel that he should not inquire further into that topic. When the trial resumed after lunch, defense counsel did not resume this line of questioning.

Evid.R. 609(A) allows a party to use a witness's prior convictions to impeach the witness's testimony. However, this Rule only applies to convictions; prior bad acts which have not resulted in convictions cannot be used as the basis for an attack upon a witness's credibility. *State v. Rodriquez (*1986), 31 Ohio App.3d 174, 176.

When the conviction is only being used to attack a witness's credibility, a trial court has broad discretion to limit any questioning of the witness on cross-examination which asks more than the name of the crime, the time and place of conviction and the punishment imposed. *State v. Robb*, 88 Ohio St.3d 59, 71, 2000-Ohio-0275. Accordingly, this court must affirm the trial court's decision absent an abuse of that discretion. *State v. Wright* (1990), 48 Ohio St.3d 5, 8. The term "abuse of discretion" connotes more than an error of law or judgment; it implies an attitude that is arbitrary, unreasonable, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

In this case, the sole purpose for using Williams' prior convictions was to attack his credibility. Accordingly, we must review the trial court's decision for an abuse of discretion.

In this case, the trial court did not abuse its discretion when it refused to let defense counsel delve into the fraud conspiracy which Williams mentioned on cross-examination. Even if Williams' fraudulent acts had resulted in a conviction (and there is no evidence supporting this conclusion in the record), the information defense counsel was seeking was far beyond the name of the crime, the time and place of conviction and the punishment imposed. Furthermore, there is no indication in the record that the facts of that possible prior conviction bear any relevance to Williams' credibility in this case.

The trial court also did not abuse its discretion when it prevented

> defense counsel from questioning Williams about drugs. There is no indication that Williams was ever convicted for any offense involving the drugs to which counsel referred. In his brief, Carter hints that criminal charges may have been filed against Williams regarding those drugs in Jefferson County and those pending charges may have given Williams a motive to lie on the stand. However, such evidence is not before this court in this appeal and, if true, would be the proper subject of a post-conviction proceeding.
>
> Finally, the trial court did not abuse its discretion when it stopped Carter's cross-examination into the length of time that Williams had been cooperating with federal authorities. After an unrecorded sidebar, the trial court concluded that the line of questioning should be discontinued. We must presume that the trial court's decision in this regard is correct, since the unrecorded sidebar could easily have revealed that counsel was just going to further delve into the facts underlying Williams' criminal history. *State v. Phillips*, 74 Ohio St.3d 72, 92, 1995-Ohio-0171.
>
> In conclusion, the trial court did not abuse its discretion when it limited the scope of Carter's cross-examination of Williams in the manners discussed above. Carter's arguments to the contrary are meritless.

*State v. Carter,* 2007 WL 1976666, at *12-14. This Report and Recommendation must first consider the applicable standard of review.

Because the state appellate court appears to have resolved Petitioner's claim in the context of State law only, this federal habeas corpus court may arguably conduct an independent review of Petitioner's claim. *See Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir. 2002)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Such review "remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Harris v. Stovall*, 212 F.3d at 943 (footnote omitted); *see also Socha v. Wilson*, 447 F.Supp.2d 809, 819 (N.D. Ohio 2007)(citing *Maldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005). Regard-less, however, of whether an independent review is conducted, or the more deferential standard of

review under the AEDPA, the Magistrate Judge concludes that the record fails to reflect that habeas corpus relief is warranted. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant's right to confront and cross-examine his accusers in order to ensure the reliability of evidence against him. *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Thus, the Constitution guarantees a criminal defendant the right to present a meaningful defense, including the right to cross examine witnesses against him. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). In *Davis v. Alaska*, 415 U.S. 308, 315 (1974), the United States Supreme Court reversed the defendant's convictions where the state trial court precluded defense counsel from inquiring on cross-examination of the State's primary witness that he had been on probation for a juvenile delinquency adjudication for burglary at the time he identified the defendant. *Id.* at 311-12. The Supreme Court held:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally

> protected right of cross-examination. *Greene v. McElroy*, 360 U.S.
> 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

*Id.* at 316 (footnote omitted). Similarly, in *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986), the

Supreme Court reversed the convictions of a defendant who was precluded, on cross examination,

from questioning the prosecution's witness about the dismissal of criminal charges for being drunk

on a highway after he had agreed to speak with the prosecutor. *Id.* at 676. In so doing, the Supreme

Court noted that trial judges retained "wide latitude" to impose "reasonable limits on cross-

examination of witnesses based on concerns about, amont other things, harassment, prejudice,

confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

relevant." *Id.* at 679. "'[T]he Confrontation Clause guarantees an opportunity for effective cross-

examination, not cross-examination that is effective in whatever way, and to whatever extent, the

defense might wish.'" *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)(*per curiam*). A

trial court is afforded wider latitude when it limits the extent of cross-examination, but does not

altogether bar a defendant's cross-examination. In such a case, a reviewing court must consider

"'whether the jury had enough information, despite the limits placed on otherwise permitted

cross-examination, to assess the defense theory.'" *Drummond v. Houk*, 761 F.Supp.2d 638, 683

(N.D. Ohio 2010)(quoting *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir.1989)). In other words, the

defendant must have been able to "'plac[e] before the jury facts from which bias, prejudice or lack

of credibility of a prosecution witness might be inferred[.]'" *Id.* "Where a trial court limits the

cross-examination of the government's 'star' witness, a reviewing court must analyze the claim with

heightened scrutiny." Id. (citing *Dorsey*, 872 F.2d at 166). Violation of the Confrontation Clause,

however, is subject to harmless error review. *Id.*( citing *Delaware v. Van Arsdall*, 475 U.S. at 673).

As discussed by the state appellate court, Williams testified he was in Steubenville on the

night in question, with "Meechie," who was deceased at the time of trial, and "Tina." *Trial Transcript*, at 903. Williams observed Petitioner and co-defendant Shane Robinson fire multiple shots at Wade. *Id*. at 924-27. Williams was in federal custody on charges of fraud conspiracy and drugs at the time of trial. He had prior convictions in 1985 for armed robbery, attempted murder, and armed violence. *Id.* at 932-33. He had a 2001 felony conviction for drugs. *Id.* On cross-examination, Williams admitted to the use of numerous aliases. *Id.* at 934-35. When defense counsel inquired as to Williams had previously used a different social security number, Williams replied, "[w]hen you using social security numbers and birthdays and names, like I said, I'm involved in a fraud conspiracy." *Id*. at 935.

> Q. Fraud conspiracy.
>
> A. Yes.
>
> Q. Tell me about that.
>
> [Objection].

*Id*. at 935-36. Petitioner complains that the trial court thereafter sustained the prosecutor's objection, stating that defense counsel could "go through the convictions" but not "the background of the convictions." *Id*. at 937. Defense counsel then elicited from Williams that he had seven social security numbers attributed to him and had been a member of the "black gangster disciples" in Chicago. *Id*. at 938. After questioning Williams regarding the facts involved during the night in question defense counsel, attempting to inquire about apparent State charges pending against Williams asked, "How about 900 grams of marijuana and 220 grams of cocaine?" *Id*. at 965.

Petitioner complains that the trial court sustained the prosecutor's objection to the question.[3]
Williams denied he had any agreements involving his trial testimony against Petitioner. Williams
had waited 2 ½ years to talk with police about witnessing Wade's murder. *Id*. at 967. When asked
why he waited so long, Williams said "it didn't concern" him, and he "didn't care about either
party." *Id.* at 968. Moreover, this had not been first time he had seen somebody get shot or killed.
*Id*. "[G]rowing up in the projects you just learn just keep on stepping and mind your business and
do what you got to do to survive and that's how I looked at it. It didn't concern me until it was
brought to my attention."

> Q. Did you seek somebody out to tell them this story?
>
> A. I never told nobody. . . . I was approached –
>
> ***
>
> All I knew while I was held in confinement that they – that they told
> me somebody was going to come and see me and. . . then I was like
> kind of shocked. I didn't even want to even have no dealings with
> [Detective Stasiulewicz]. I told him I ain't got nothing to say, you
> know. . . .

---

[3] Specifically, the following discussion transpired:

COURT: I want no further discussion of that. None. Don't come back to it.
Don't kind of come back to it. Don't allude to it and don't do that again.

MR. OLIVITO: Okay.

COURT: I mean it. Don't do it again.

**

COURT: With this witness or any other witness. We're done with that kind of
stuff.

*Id*. at 966.

Q.  But you did eventually tell what happened.

A.  Yes.  After talking to my lawyer and – and talking to the Federal prosecutors and they call it accepting responsibility.  That's like a prophet.  Once, you know, when you accept your responsibility, you got to talk about anything that you was involved in or anything you have knowledge of and once I revealed that during that meeting, then I had to come forth with everything. . . . [O]r I wouldn't be accepting my responsibility. . . . [B]ecause I'm under Federal guidelines.  So. . . that's how the Feds look at things.

Q.  And you're accepting a responsibility by telling me what you know.

A.  Yes.

Q.  And what you saw.

A.  That's . . . how the sentencing guidelines is written up. . . .

***

Q.  You're doing what's right.

A.  Right.

*Id*. at 967-971.  On cross-examination, Williams stated he had been working with the federal prosecutor from 1998 to 2004.  *Id*. at 973.  The prosecutor requested to approach the bench, and the trial transcript indicates a discussion took place between the parties and the court out of the presence of the jury, after which time the trial court recessed for lunch.  *Id*. at 974.  Afterwards, the trial transcript indicates in relevant part as follows:

MR. OLIVITO: Your Honor, I was on cross.  We had a discussion about certain things which you then carried over into a private discussion with Mr. Williams and then we broke for lunch about that time.  I – I hadn't finished cross.  I thought we broke because of that situation.

COURT: Do we need any more discussion about whatever –

MR. OLIVITO: No.

COURT: Good. . . . And we're done with that topic.

MR. OLIVITO: That's fine.

*Id*. at 982-83. Petitioner complains that, as a result of this last exchange, the trial court improperly prohibited him from cross-examination of Williams regarding his plea agreement with the federal prosecutors.

A federal habeas corpus court's review of a petitioner's claim is limited to the record before the state appellate court when it reviewed the claim. *Cullen v. Pinholster*, – U.S. –, 131 S.Ct. 1388, 1398 (2011). Considering Petitioner's claim in view of that record the state appellate court, the Magistrate Judge finds that the state court's claim that he was denied his right to confront and cross examine Williams[4] was not an unreasonable application of clearly established federal law. The record before the state appellate court failed to reflect that Williams had pending State charges against him. Under these circumstances, Petitioner cannot establish the trial court improperly refused to permit questioning regarding pending charges for which Williams may have been attempting to curry favor with the State. The record likewise fails to reflect the trial court prohibited defense counsel from further cross-examination of Williams regarding his guilty plea agreement with federal prosecutors, in view of defense counsel's statement that he did not need any further on-the-record discussion of the topic, and that he was finished cross-examining Williams on the issue. The record before the state appellate court, and therefore likewise for consideration in these

---

[4] Petitioner contends that he raised this claim as well in post conviction proceedings; however, the record reflects that Petitioner failed to raise a Confrontation Clause claim in his appeal of the trial court's decision denying his post conviction petition. *See State v. Carter*, 2008 WL 5228925.

proceedings, in regard to Petitioner's Confrontation Clause claim, indicates that the trial court prohibited Petitioner from inquiring into the details, but not the fact, of Williams' prior convictions. Nonetheless, Petitioner effectively established that Williams had an extensive criminal history, was of an unsavory character, had used multiple aliases and social security numbers, and was awaiting sentencing on apparent federal charges of a fraud conspiracy. In view of this record, *i.e.*, the record before the state appellate court, Petitioner has failed to reflect that habeas corpus relief is warranted.

Claim two is without merit.

## CLAIMS THREE and SIX

In claim three, Petitioner asserts that he was denied a fair trial due to admission of evidence that his co-defendant, Shane Robinson, attempted to bribe Williams and other defense witnesses. In claim six, Petitioner asserts he was denied a fair trial due to prosecutorial misconduct. These claims are closely related and will be considered together here. The Ohio Court of Appeals rejected Petitioner's claims as follows:

> Carter argues:
>
> "The prosecutor's pervasive misconduct during the course of the Appellant's entire trial denied the Appellant his right to a fair trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution and merits a reversal of Appellant's convictions and a new trial."
>
> The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears,* 86 Ohio St.3d 329, 332, 1999-Ohio-0111. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15. "The touchstone of analysis 'is the fairness of the

trial, not the culpability of the prosecutor.'" *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, at ¶ 61, quoting *Smith,* 455 U.S. at 219. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, at ¶ 121. A failure to object to alleged prosecutorial misconduct waives all but plain error. *Hanna* at ¶ 77; *LaMar* at ¶ 126.

Because Carter argues the prosecutor committed misconduct in a variety of different ways, we will address each of his claims in turn.

## Witness Tampering

Carter argues that the prosecutor committed misconduct by arguing that Carter was guilty of murder because of evidence that Robinson had both offered to buy and actually bought the testimony of certain witnesses. He contends that these acts are inadmissible as evidence against him since there is no indication that he knew of or authorized those offers or payments and that their introduction is simply an attempt to tarnish him through the discredited doctrine of guilt by association.

Carter is correct that evidence that an attempt by a third-party to bribe or otherwise influence a witness is generally inadmissible against a defendant. *State v. Smith* (1990), 49 Ohio St.3d 137, 143; *State v. Walker* (1978), 55 Ohio St.2d 208, 215; *Mefford v. State* (1920), 13 Ohio App. 106, 107. However, such evidence is admissible if the State can prove the defendant knew of or authorized such an attempt. *Id*. If two codefendants are tried together and the State introduces evidence that a co-defendant bribed a witness, but does not prove that the defendant knew of the bribery attempt, then the trial court errs if it does not grant a mistrial to the defendant, unless the evidence of the defendant's guilt is overwhelming. *Smith; State v. Nicholson*, 8th Dist. No. 84527, 2005-Ohio-1703.

Courts from other states have held that there is sufficient circumstantial evidence that a defendant knew and approved of an attempt to influence a witness if the defendant was present during such an attempt. *See Saunders v. State* (Fla.1989), 547 So.2d 193; *Bennett v. Commonwealth* (1917), 175 Ky. 540, 194 S.W. 797. However, no Ohio court has yet been faced with such a situation.

In this case, the prosecutor elicited testimony showing that Robinson both attempted to and actually bribed witnesses. However, he did not introduce any evidence showing that Carter knew about or approved of those attempts. Nevertheless, we cannot conclude that the

prosecutor committed misconduct when asking these questions.

First, evidence that tends to demonstrate the attempted bribery of a witness by a defendant is admissible against that defendant since such an attempt is an admission of guilt. *State v. Hunt*, 8th Dist. No. 84528, 2005-Ohio-1871, at ¶ 8. Thus, it was completely proper for the prosecutor to inquire into Robinson's attempts at bribery since Robinson was a defendant at trial.

Furthermore, the prosecutor may have been able to prove that Carter either knew or approved of Robinson's bribery attempts. If he had such proof, such as Carter's presence during the bribery attempts, then evidence of Robinson's bribery attempts would be admissible against Carter. *See, generally*, Admissibility in criminal case, on issue of defendant's guilt, of evidence that third person has attempted to influence a witness not to testify or testify falsely, 79 A.L.R.3d 1156. Likewise, the prosecutor may have had a good faith basis for asking these types of questions. Such evidence was not introduced because defense counsel did not raise the issue. Finally, the prosecutor may have reasonably believed that any harm to Carter would be mitigated by a curative instruction by the trial court if Carter had objected to the introduction of this testimony. For instance, the First Circuit has held that any risk of prejudice in this type of testimony is cured by an instruction that the jury is not to consider the testimony in any manner as to the defendant. *U.S. v. Colon-Munoz* (1st Cir.1999), 192 F.3d 210.

Thus, we cannot conclude that the prosecutor committed misconduct by asking these questions for many reasons. Accordingly, Carter's prosecutorial misconduct argument with regard to questions about witness tampering is meritless.

Birden's Failure to Appear for Rebuttal

Carter next argues that the prosecutor committed misconduct when it improperly discredited Birden's testimony in the eyes of the jury by highlighting the fact that she did not appear to testify on rebuttal in contravention of a court order that she do so.

In its cross-examination of Birden, the State asked her whether she received a certain phone call and whether she would be surprised if there was a recording of that phone call. After asking these questions, the prosecutor informed the trial court at a sidebar that it had a copy of this tape, but did not wish to play it at this time. Instead, the prosecutor stated that he preferred to recall Birden on rebuttal and play the tape at that time. The trial court then excused Birden from the witness stand, but told her "I think you're going to be recalled. So,

29

we need for you to stay," to which Birden replied, "Okay."

At the end of the day, the prosecutor asked to ensure that the defense witness which he planned to call the next day in rebuttal knew that they should appear. The trial court asked if Birden was still present, since it had specifically told her to stay. Defense counsel informed the trial court that she was not in the hall and the prosecutor speculated that she must have left. The prosecutor asked the trial court if it felt that he should subpoena her to appear the next day, but the trial court answered that it did not believe that this was necessary. The prosecutor then told the trial court that he had four phone numbers he could use to contact Birden and that he would "track her down."

The next day, the State began its presentation of the evidence on rebuttal by calling Birden to the stand. The bailiff informed the trial court, in the jury's presence, that Birden was not present. At a sidebar, the prosecutor said he tried contacting Birden at the three phone numbers available to him, but that there was no answer at two of the numbers and no minutes available for the third number. The prosecutor then called his next witness.

During closing argument, the prosecutor used Birden's failure to appear for rebuttal to impeach her testimony.

"Daphne Birden, [defense counsel] didn't even mention her [during his closing argument]. You know why he didn't mention her? Because she didn't come back. She left and was told by the Judge to come back and she didn't even come back. Why? Because of the tape. I told her I was going to play it for her. Come back to listen to it. I guess she wasn't interested. Speaks volumes.

"What people don't say is as important as the things they do say. What people don't do is as important as the things that they do. * * *

"Daphne Birden doesn't seek the truth. She gets paid for the truth. Her truth, whatever the price is, she must not have gotten paid enough. She could only tell half of the story."

A prosecutor is encouraged to prosecute with earnestness and vigor. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, citing *Berger v. United States* (1935), 295 U.S. 78, 88. Nevertheless, there are limitations on what a prosecutor may do at trial. For example, prosecutors may not allude to matters not supported by admissible evidence in their closing argument. *Id.* The prosecutor in this case did just that. There was never any evidence before the jury that Birden disobeyed the trial court's order by not returning to be called as a rebuttal witness. Likewise, there is no evidence that the prosecutor told Birden he was

going to play the tape. The prosecutor used these facts, which were not based on admissible evidence, to directly attack Birden's credibility. This was clearly misconduct.

Nevertheless, Carter has not shown that he was prejudiced by this misconduct. There was a second reason to doubt Birden's testimony, Wrenn's testimony that Robinson bribed Birden. The prosecutor also mentioned this during closing argument. This ground alone is enough to seriously doubt Birden's credibility. Accordingly, we cannot conclude that the prosecutor's remarks in this case were enough, on their own, to require a reversal. Carter's arguments to the contrary are meritless.

## Closing Argument

Carter contends that much of the State's closing argument consisted of a deliberate attempt to appeal to the jury's emotions, repeated interjection of the prosecutor's personal opinion, repeated references to facts outside the record, and denigration of defense counsel. The State contends that Carter has waived all but plain error in regard to the prosecutor's comments during closing argument and that those comments do not constitute misconduct.

When reviewing the statements a prosecutor makes during closing argument for prosecutorial misconduct, the Ohio Supreme Court has instructed appellate courts to give prosecutors "a certain degree of latitude in summation. The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." (Citations omitted) *State v. Treesh,* 90 Ohio St.3d 460, 466, 2001-Ohio-0004.

Despite the fact that prosecutors are encouraged to argue fervently for conviction, see *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 13-14. Furthermore, a prosecutor cannot go beyond the evidence which is before the jury when arguing for a conviction. *Id.*

Carter argues that the prosecutor's entire closing argument was designed to appeal to the juror's emotions, but a review of the entire argument does not support this contention. The prosecutor certainly began and finished his closing argument with references to the loss that Wade's family suffered. However, the bulk of the closing argument is based on the evidence introduced at trial and the prosecutor's inferences from that evidence. "[A] conviction based

solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal." *State v. Williams* (1986), 23 Ohio St.3d 16, 20. But "[r]ealism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." *State v. Keenan*, 66 Ohio St.3d 402, 409. The prosecutor did not excessively appeal to the jury's emotions with his references at the beginning and end of his argument.

Carter next contends that the prosecutor improperly expressed his personal belief or opinion numerous times and made numerous references to facts outside the record. However, a prosecutor is permitted to make reasonable inferences from the evidence and many of these instances are nothing more than inferences from the evidence. See *Treesh* at 466. For instance, the prosecutor told the jury, "I know what happened in this case." However, he followed this up by explaining that he and the jury knew what happened because they had all heard the testimony. Clearly, the prosecutor's statement was an inference based on the evidence.

Similarly, the prosecutor referred to Carter as someone who kills people. But this statement does not indicate that the prosecutor has knowledge of facts outside the record. Instead, it shows that he reached this conclusion based on the evidence in this case.

Finally, Carter complains about the references to him and Robinson being drug dealers. However, a witness testified that Carter and Robinson were angry because drugs were stolen in the robbery of Robinson's brother. And the State's whole case was based on the theory that Robinson and Carter sought revenge on Wade because of that robbery. The prosecutor's comments were merely inferences from evidence in the record.

Other examples of this type of prosecutorial misconduct which Carter cites, such as the feelings of people on the street, speculation about whether Robinson and Carter planned the shooting before it occurred, and speculation on exactly what occurred at the scene of the crime, are more obviously examples of inferences based on the evidence.

Finally, Carter maintains that the prosecutor improperly denigrated defense counsel in his closing argument. This argument is baseless. During trial, a witness testified that he saw a defense witness receive money from Robinson shortly after that defense witness spoke to defense counsel. The prosecutor's recitation of these facts at closing argument is proper and does not denigrate counsel since it does not infer that counsel knew or approved of the alleged bribes.

Carter's arguments concerning the prosecutor's comments during closing statements are all meritless.

*State v. Carter*, 2007 WL 1976666, at *4-9.

As to Petitioner's assertion that he was denied a fair trial by introduction of evidence indicating Petitioner's co-defendant, Shane Robinson, attempted to bribe or bribed prosecution witnesses, the state appellate court rejected this claim as follows:

> Carter argues:
>
> "The trial court denied Appellant his rights to a fair trial and due process of law by permitting witness testimony that did not conform to Evid.R. 401, 403, and 404(B)."
>
> In this assignment of error, Carter contends that the trial court erred when allowing evidence of. . . Robinson's attempts to bribe witnesses. He contends that this evidence is inadmissible character evidence which was not introduced for any of the permissible purposes under Evid.R. 404(B), which bars the use of "other acts" evidence to prove the character of a person in order to show that he acted in conformity therewith.
>
> ***
>
> Character evidence is generally not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion. Evid.R. 404(A). Thus, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). This rule of evidence is in accord with R.C. 2945.59, which allows this kind of evidence to come in for particular purposes in a criminal case.
>
> "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." *Id.*

"The focus of the inquiry into the admissibility of other-acts evidence is whether the evidence is being offered for the impermissible purpose of proving that the accused acted in conformity with his or her criminal character in committing the charged offenses, or whether the evidence is being offered for another purpose." *State v. Pearson* (1996), 114 Ohio App.3d 168, 185. Because Evid.R. 404(B) and R.C. 2945.59 contain exceptions to the common-law rule that such other-acts evidence is inadmissible, both provisions must be construed strictly against the admissibility of such evidence. *State v. Broom* (1988), 40 Ohio St.3d 277, paragraph one of the syllabus.

\*\*\*

Carter next argues that the trial court erred by allowing evidence of Robinson's bribery attempts since such testimony was improper "other acts" evidence. However, this evidence was clearly not introduced to show that Robinson has a propensity to bribe. Instead, the bribe to Daphne Birden was offered to show that she had a motive to perjure herself when testifying on the defendants' behalf. Likewise, the attempted bribe to Williams was not introduced to demonstrate Robinson's character.

Carter clearly has valid complaints regarding the admission of Robinson's bribery attempts. However, his complaints have nothing whatsoever to do with the admissibility of that evidence under Evid.R. 404(B). Accordingly, Carter's arguments in this regard are meritless.

*State v. Carter*, 2007 WL 1976666, at *18.

To the extent that Petitioner argues that admission of evidence that his co-defendant, Shane Robinson, bribed or attempted to bribe prosecution witnesses denied him a constitutionally fair trial, this claim is without merit. Federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir.1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th

Cir.1983). When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged. *Carter v. Jago*, 637 F.2d 449, 457 (6th Cir.1980). Such are the circumstances here.

As to Petitioner's claim of prosecutorial misconduct, a federal habeas corpus court's review of a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 642 (1974)). For prosecutorial misconduct to rise to the level of a constitutional violation, the conduct of the prosecutor must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Broom v. Mitchell,* 441 F.3d 392, 412 (6th Cir. 2006) (quoting *Donnelly,* 416 U.S. at 643); *see also Darden*, 477 U.S. at 181. Thus, "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins,* 209 F.3d 486, 529 (6th Cir.2000).

When analyzing a claim of prosecutorial misconduct, a federal court must first determine whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). If improper, the court must examine whether the statements were so flagrant as to constitute a denial of due process and warrant the granting of a writ. Even if the prosecution's conduct was improper, or even "universally condemned," a federal court can only reverse a conviction or sentence if the statements were so flagrant as to render the entire trial fundamentally unfair. *See e.g., Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir. 2006). A court makes that determination by considering the following four factors:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or

accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates v. Bell,* 402 F.3d 635, 641 (6th Cir.2005); *see also Bowling v. Parker,* 344 F.3d 487, 512-13

(6th Cir. 2003). Relief will not be granted unless the conduct of the prosecutor "likely had a bearing

on the outcome of the trial...." *Byrd,* 209 F.3d at 530.

For the reasons addressed by the state appellate court, the Magistrate Judge finds that Petitioner has met this burden here.

Claims three and six are without merit.

## CLAIM FOUR

In claim four, Petitioner asserts he was denied effective assistance of counsel because his attorney suffered an improper conflict in interest due to his dual representation of both Petitioner and his co-defendant, Shane Robinson. Petitioner also asserts the ineffective assistance of counsel based on his attorney's failure to request a severance of trials, failure to object to inadmissible evidence, to proffer information into the trial record to preserve appellate issues and failure to present evidence to impeach Williams' testimony that Robinson had offered him a bribe. The state appellate court rejected this claim on direct appeal as follows:

> Carter argues that his counsel is ineffective for many reasons and we will address each of those arguments separately.

> Conflict of Interest

> In this case, the same defense counsel represented both Carter and Robinson at their joint trial. Prior to trial, the State offered Carter a plea agreement, which was contingent upon Carter's agreement to testify against Robinson. At two hearings, the trial court inquired into whether Carter wanted to discuss the plea offer with separate, court-appointed counsel. Each time, Carter refused. Carter contends

that the trial court's efforts were insufficient since it waited to make its inquiry until shortly before trial and failed to ensure that Carter's acceptance of joint representation was voluntary and knowing.

In cases of potential conflict of interest resulting from one attorney representing co-defendants, the United States Supreme Court has held that dual representation is not a per se violation of due process and, in some cases, it may be preferable to launch a common defense against a common attack. *Holloway v. Arkansas* (1978), 435 U.S. 475, 482-483. However, the possibility of a conflict of interest exists in every instance of multiple representation. *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348.

Both defense counsel and the trial court have an affirmative duty to ensure that conflicts do not interfere with a defendant's representation. *State v. Dillon,* 74 Ohio St.3d 166, 167-68, 1995-Ohio-0169. If defense counsel recognizes a potential conflict in his representation of both clients, he should timely object to his dual representation and move the court to withdraw from representing at least one of the two defendants since he "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Holloway* at 485. If an attorney makes such an objection, the trial court must either appoint separate counsel or "take adequate steps to ascertain whether the risk [of conflict] was too remote to warrant separate counsel." *Id.* at 484. Failure to make such an inquiry when faced with a timely objection deprives the defendant of his constitutional guarantee of effective assistance of counsel. *Id.* Consequently, when a court requires joint representation over objection without making sufficient inquiry, prejudice is presumed, and reversal is required. Id. at 488.

In some cases, neither counsel nor defendant raises an objection to the joint representation. In those cases, "[a] trial court is not constitutionally mandated to inquire of criminal co-defendants whether they wish to be jointly represented by the same counsel." *State v. Manross* (1988), 40 Ohio St.3d 180, syllabus. A trial court's duty to inquire only arises when it "knows or reasonably should know that a particular conflict exists." *Id.* at 181. Absent any indication to the contrary, a trial court may assume that either the joint representation presents no conflict or that the lawyer and clients have knowingly accepted the risk of any conflict that may exist. *Cuyler* at 347. In those situations where no objection is raised to the trial court regarding the joint representation, the defendant's conviction will only be reversed if he "shows that an actual conflict adversely affected counsel's representation of said defendant."

*Manross* at syllabus; *Cuyler* at 348.

In this case, the prosecution's plea offer created an actual conflict of interest between Carter and Robinson, since a condition of that offer was that Carter testify against Robinson. However, we cannot tell from the record whether counsel's joint representation adversely affected Carter. In particular, it is impossible to say, at this stage in the proceedings, whether separate counsel would have advised Carter to accept the plea offer and/or whether Carter would have taken this advice and actually accepted that offer. Carter is merely asking that this court speculate as to the effect of separate counsel on this decision. We cannot do so. This is an issue which is the proper subject of post-conviction proceedings.

Failure to Seek Severance

Carter next argues that his counsel was ineffective for failing to request separate trials for Carter and Robinson. He claims that counsel's ineffectiveness in this regard allowed damning evidence against Robinson, namely evidence of Robinson's prior actions with a firearm and of Robinson's bribery attempts, to be used against him as well.

Joinder is governed by R.C. 2945.13, which provides as follows:

"When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."

The law favors joinder because a single trial will conserve time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 86-87; *State v. Torres* (1981), 66 Ohio St.2d 340, 343; *State v. Thomas* (1980), 61 Ohio St.2d 223, 225. However, the interest in joint trials is not unrestricted. Crim.R. 14 allows a trial court to sever the defendants or provide other relief in the interest of justice if a defendant can demonstrate that he is prejudiced by joinder with other defendants charged in the indictment. Severance may be warranted if the trial court finds a serious risk that a joint trial would compromise a specific right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. *United States v. Zafiro* (1993), 506 U.S. 534, 539.

In this case, Carter argues that joinder of the trials allowed evidence which was inadmissible against him, namely, Robinson's prior brandishment of a firearm and bribery attempts, to be used against

him. The most damning of these two types of evidence is the evidence that Robinson had attempted to bribe witnesses. However, trial counsel could not have been ineffective for failing to request severance because of the bribery evidence since that evidence was rebuttal evidence which was not made known to counsel prior to trial. Counsel could not reasonably be expected to anticipate that the State may bring evidence that one co-defendant attempted to bribe witnesses when he is not given any advance warning of such evidence prior to trial.

Furthermore, counsel was not ineffective for failing to request a severance due to the evidence that Robinson had brandished a firearm in the month prior to Wade's death. This evidence was, for the most part, cumulative of other evidence already introduced. Many witnesses testified that tensions had been rising between Robinson and Carter on one side and Sayles and his friends on the other. Many witnesses testified that they had seen Robinson with a firearm. Thus, the fact that Robinson had brandished a firearm at Sayles and Sayles's friend added little.

In conclusion, counsel was not ineffective for failing to request that the trial be severed. Carter's arguments to the contrary are meritless.

Failure to Object to Hearsay Evidence

Carter next argues that defense counsel was ineffective for failing to object to the admission of statements made by Robinson as substantive evidence against him. This argument is similar to the one addressed in Carter's fourth assignment of error. For the reasons given in that assignment of error, Carter's arguments in this regard are meritless.[5]

_____

[5] The state appellate court discussed admission of the hearsay evidence at issue as follows:

Wrenn testified that he took Daphne Birden to see defense counsel soon before trial. After leaving counsel's office, Wrenn took her to see Robinson. Daphne Birden went into a room with Robinson and came out with $470.00. She then told Wrenn, "Damn, we got paid good for doing this."

Daphne Birden's statement is clearly hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Daphne Birden's statement was an out-of-court statement made by someone other than the witness (Wrenn), which was offered to prove the truth of the matter asserted (That Daphne Birden was bribed). Accordingly, it was improper to admit this evidence

Failure to Object to Prosecutorial Misconduct

Carter's final argument within this assignment of error is that his counsel was ineffective for failing to object to the instances of prosecutorial misconduct he raises in his second assignment of error. For the reasons given above, this alleged misconduct was either not misconduct or did not affect Carter's substantial rights. Accordingly,

---

unless one of the exceptions to the hearsay rule applies.

The State contends that the statement could be admissible as either a present sense impression, under Evid.R. 803(1), or an excited utterance, under Evid.R. 803(2). We agree, especially since Carter objected to Wrenn's testimony generally, but did not specifically object to this statement.

Evid.R. 803(2) allows a statement which would otherwise be inadmissible hearsay to be admitted if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The admissibility of such statements does not depend upon the availability of the declarant as a witness. Evid.R. 803. Such statements are admissible because "[t]he circumstances surrounding an excited utterance-a startling event, a statement relating to that event, a declarant under the stress of the event-do not allow the declarant a meaningful opportunity to reflect on statements regarding the event. Without opportunity to reflect, the chance that a statement is fabricated, or distorted due to a poor memory, is greatly reduced." *State v. Wallace* (1988), 37 Ohio St.3d 87, 88.

In this case, Daphne Birden's statement was made immediately after she received the alleged bribe, an event which the trial court could reasonably have concluded would be a startling event. The statement was related to that event and, given the immediacy between event and statement, the trial court could have reasonably concluded that Daphne Birden was under the excitement of the event when making the statement. These conclusions are stronger since Carter did not challenge this particular testimony as hearsay or test its admissibility under this hearsay exception.

The excited utterance hearsay exception is a firmly rooted hearsay exception with sufficient guarantees of trustworthiness. *State v. Shoop* (1993), 87 Ohio App.3d 462, 473. Accordingly, the admission of this testimony did not violate Carter's rights under the Confrontation Clause.

*State v. Carter,* 2007 WL 1976666, at *15-16.

Carter's arguments in this regard are also meritless.

Right to Confront Adverse Witnesses

In his fourth assignment of error, Carter argues:

"The Appellant was denied his right to confront the witnesses against him under the Sixth Amendment of the United States Constitution and Article I Section 10 of the Ohio Constitution."

In this assignment of error, Carter contends that he was deprived of his right to cross-examine the witnesses against him in three ways: 1) by limiting the defense's ability to cross-examine the State's only eye witness, Carl Williams, about his criminal history; 2) by allowing the prosecution to introduce testimony which was not based on the witness's personal knowledge; and, 3) by admitting statements by Robinson, Carter's non-testifying co-defendant, as substantive evidence of Carter's guilt. Each of these issues will be addressed in turn.

Cross-Examination of Williams

Carter's defense at trial was to attack the credibility of the State's only eye witness, Williams. He claims the trial court wrongfully prevented him from presenting this defense in full by limiting Carter's ability to inquire into Williams' criminal history. Carter complains of three specific instances when the trial court sustained an objection, which limited his ability to cross-examine Williams on certain subjects. In the first instance, defense counsel was asking Williams about various identities he had used in the past. Williams explained that he had more than one identity because he was "involved in a fraud conspiracy." Counsel then asked Williams, "Tell me about that," to which the prosecutor objected. The trial court sustained the objection and explained at a sidebar that defense counsel could inquire into Williams' convictions, but not the background of those convictions. Defense counsel then began questioning Williams on a different subject.

In the second instance, defense counsel was cross-examining Williams about the specifics of what he allegedly saw at the scene and comparing these statements to Williams' prior statements to police. After Williams responded that he may have to have his memory refreshed, counsel asked, "How about 900 grams of marijuana and 220 grams of cocaine?" The prosecutor objected, the trial court sustained the objection, and the parties then had a sidebar. At the sidebar, the prosecutor stated that Williams had not been convicted for anything regarding those drugs and the trial court stated

that he wanted "no further discussion" of those issues and, "We're done with that kind of stuff." Defense counsel then began questioning Williams on other topics.

In the final instance which Carter cites, defense counsel was asking Williams about how long Williams had been cooperating with federal authorities during recross-examination. The prosecutor objected to these questions and the trial court excused the jury for lunch without ruling on the objection. At a sidebar, the trial court indicated that the parties held an unrecorded conference at which they discussed the objection and instructed counsel that he should not inquire further into that topic. When the trial resumed after lunch, defense counsel did not resume this line of questioning.

Evid.R. 609(A) allows a party to use a witness's prior convictions to impeach the witness's testimony. However, this Rule only applies to convictions; prior bad acts which have not resulted in convictions cannot be used as the basis for an attack upon a witness's credibility. *State v. Rodriquez* (1986), 31 Ohio App.3d 174, 176.

When the conviction is only being used to attack a witness's credibility, a trial court has broad discretion to limit any questioning of the witness on cross-examination which asks more than the name of the crime, the time and place of conviction and the punishment imposed. *State v. Robb*, 88 Ohio St.3d 59, 71, 2000-Ohio-0275. Accordingly, this court must affirm the trial court's decision absent an abuse of that discretion. *State v. Wright* (1990), 48 Ohio St.3d 5, 8. The term "abuse of discretion" connotes more than an error of law or judgment; it implies an attitude that is arbitrary, unreasonable, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

In this case, the sole purpose for using Williams' prior convictions was to attack his credibility. Accordingly, we must review the trial court's decision for an abuse of discretion.

In this case, the trial court did not abuse its discretion when it refused to let defense counsel delve into the fraud conspiracy which Williams mentioned on cross-examination. Even if Williams' fraudulent acts had resulted in a conviction (and there is no evidence supporting this conclusion in the record), the information defense counsel was seeking was far beyond the name of the crime, the time and place of conviction and the punishment imposed. Furthermore, there is no indication in the record that the facts of that possible prior conviction bear any relevance to Williams' credibility in this case.

The trial court also did not abuse its discretion when it prevented defense counsel from questioning Williams about drugs. There is no indication that Williams was ever convicted for any offense involving

the drugs to which counsel referred. In his brief, Carter hints that criminal charges may have been filed against Williams regarding those drugs in Jefferson County and those pending charges may have given Williams a motive to lie on the stand. However, such evidence is not before this court in this appeal and, if true, would be the proper subject of a post-conviction proceeding.

Finally, the trial court did not abuse its discretion when it stopped Carter's cross-examination into the length of time that Williams had been cooperating with federal authorities. After an unrecorded sidebar, the trial court concluded that the line of questioning should be discontinued. We must presume that the trial court's decision in this regard is correct, since the unrecorded sidebar could easily have revealed that counsel was just going to further delve into the facts underlying Williams' criminal history. *State v. Phillips*, 74 Ohio St.3d 72, 92, 1995-Ohio-0171.

In conclusion, the trial court did not abuse its discretion when it limited the scope of Carter's cross-examination of Williams in the manners discussed above. Carter's arguments to the contrary are meritless.

*State v. Carter,* 2007 WL 1976666, at *9-14. The state appellate court rejected Petitioner's claim

in post conviction proceedings as follows:

To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley,* 42 Ohio St.3d at paragraph three of the syllabus.

Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. *Id.*

First, appellants contend their counsel was ineffective for failing to

proffer for the record several pieces of evidence that they assert would have impeached Williams' credibility. The trial court sustained the prosecutor's objections and limited appellants' attorney on cross-examination of Williams regarding the facts surrounding his federal fraud and conspiracy convictions, his pending state drug charges, and his cooperation in testifying in appellants' case. Appellants argue that their attorney should have proffered Williams' pending state warrant and indictment and his federal plea agreement. Appellants argue that their counsel's failure to proffer these items denied them from successfully arguing to this court in their direct appeals that the trial court's ruling on these matters was in error.

In ruling on this issue, the trial court found, "[e]vidence that* * * [Williams] had made a plea agreement in Federal Court was before the jury and was available for consideration by them. Evidence of the witnesses [sic.] numerous aliases, social security numbers and dates of birth were also before the jury." The trial transcript supports the court's findings. Williams testified that he was in prison for fraud, conspiracy, and drugs. (Trial Tr. 932). Additionally, appellants' counsel cross-examined Williams regarding his numerous aliases, social security numbers, and dates of birth. (Trial Tr. 934, 935). And Williams testified that he had to come clean about everything he knew as part of his deal with the "Feds." (Trial Tr. 970).

Additionally, appellants' counsel could not have cross-examined Williams regarding his pending state drug charges because Williams had not been convicted of those charges and had not entered into a deal with the state regarding those charges.

Appellants also argue that their counsel was ineffective because he failed to make a record and present evidence to refute testimony by Williams that he had a conversation with Robinson after the shooting whereby Robinson offered him a bribe to keep quiet. Appellants contend that Robinson was in jail on a probation violation on the day that Williams testified that he had this conversation with Robinson at the Elks Club. Appellants state that their counsel was aware of this fact yet did not present this evidence to the jury.

This issue could have been raised in appellants' direct appeals. "[A] defendant cannot raise an issue in a motion for postconviction relief if he or she could have raised the issue on direct appeal." *State v.*

*Reynolds* (1997), 79 Ohio St.3d 158, 161, 679 N.E.2d 1131.

Furthermore, it was brought out at the post-conviction hearing that appellants' trial counsel was aware that Robinson was in jail on the date of the alleged conversation with Williams and elected not to put this information before the jury. (Tr. 38). According to Robinson, counsel did not want the jury to know that he had been in jail. (Tr. 38). This was a matter of trial strategy. This court does not use hindsight to second-guess instances of trial strategy that backfire as there is a wide range of professional competence and of appropriate trial tactics. *State v. Simmons,* 7th Dist. No. 06-JE-4, 2007-Ohio-1570, at ¶ 166; *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965.

Additionally, Carter alleges one other instance of alleged ineffectiveness. He contends that his trial counsel had a conflict of interest because of his dual representation of both appellants.

Carter raised this issue in his direct appeal as it related to a plea deal offered to him by the state which would have required that he testify against Robinson. *State v. Carter,* 7th Dist. No. 05-JE-7, 2007-Ohio-3502. We set out the pertinent facts as follows:

"Prior to trial, the State offered Carter a plea agreement, which was contingent upon Carter's agreement to testify against Robinson. At two hearings, the trial court inquired into whether Carter wanted to discuss the plea offer with separate, court-appointed counsel. Each time, Carter refused. Carter contends that the trial court's efforts were insufficient since it waited to make its inquiry until shortly before trial and failed to ensure that Carter's acceptance of joint representation was voluntary and knowing." *Id.* at ¶ 56.

We then found:

"In this case, the prosecution's plea offer created an actual conflict of interest between Carter and Robinson, since a condition of that offer was that Carter testify against Robinson. However, we cannot tell from the record whether counsel's joint representation adversely affected Carter. In particular, it is impossible to say, at this stage in the proceedings, whether separate counsel would have advised Carter

to accept the plea offer and/or whether Carter would have taken this advice and actually accepted that offer. Carter is merely asking that this court speculate as to the effect of separate counsel on this decision. We cannot do so. This is an issue which is the proper subject of post-conviction proceedings." *Id.* at ¶ 60.

Carter still has not presented any evidence of actual prejudice. In support of his argument, Carter points to several facts that came out at the post-conviction hearing. First, he points out that his counsel testified that although he arranged for Carter to meet with another attorney, the other attorney had limited knowledge of the case. (Tr. 86). Additionally, Carter points to his own testimony that his counsel reassured him that he had nothing to worry about if he proceeded with the dual representation. (Tr. 55). Next, Carter points to his counsel's testimony that he never had a discussion with Carter concerning evidence that might otherwise be inadmissible against him if he had a separate trial. (Tr. 87). Finally, Carter points to his testimony that during the trial he became concerned about the dual representation but that he felt he could not do anything about it at that point. (Tr. 56).

None of the testimony that Carter points to demonstrates actual prejudice to him. It is still "impossible to say * * * whether separate counsel would have advised Carter to accept the plea offer and/or whether Carter would have taken this advice and actually accepted that offer." *Carter,* 7th Dist. No. 05-JE-7, at ¶ 60. Carter presented no evidence going to the issue of the plea deal nor did he otherwise demonstrate real prejudice as is required for a claim of ineffective assistance of counsel.

Consequently, appellants' second assignments of error are without merit.

Failure to Object to Hearsay Evidence

Carter next argues that defense counsel was ineffective for failing to object to the admission of statements made by Robinson as substantive evidence against him. This argument is similar to the one addressed in Carter's fourth assignment of error. For the reasons given in that assignment of error, Carter's arguments in this regard are meritless.

*State v. Carter*, 2008 WL 5228925, at *6-8. As discussed, on habeas corpus review, a federal court must defer to the findings of fact and conclusions of the state appellate court. In assessing a claim of ineffective assistance of counsel, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, – , 129 S.Ct. 1411, 1420 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Petitioner has a Sixth Amendment right to conflict-free counsel. *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir.2006)(citing *Smith v. Anderson,* 689 F.2d 59, 62-63 (6th Cir. 1982)). Defense counsel owes the client a duty of loyalty, and that includes the duty to avoid conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980)). The joint representation of two co-defendants does not constitute a *per se* violation of the right to effective assistance of counsel. *Brooks v. Bobby*, 2006 WL 2456494, at *8 (N.D. Ohio Aug. 22, 2006)(citing *Glasser v. United States,* 315 U.S. 60, 70 (1942). To establish a Sixth Amendment violation resulting from one attorney representing two co-defendants at trial, a defendant who fails to object at trial must demonstrate an actual conflict of interest that adversely affected his attorney's performance. *Cuyler v. Sullivan*, 446 U.S. at 348. A trial court must conduct an inquiry into an alleged conflict where it knows or reasonably should know that a particular conflict exists, or when an attorney or one of the parties objects to the joint representation. *Mickens v. Taylor,* 535 U.S. 162, 168-69 (2002)(quoting *Cuyler v. Sullivan*, 446 U.S. at 347-48 (footnote omitted); *see also Moss v. United States,* 323 F.3d 445, 470-71 (6th Cir. 2003). A criminal defendant has the right to privately retained counsel of his or her own choosing, and may waive the right to representation by a conflict-free attorney, so long as that waiver must be knowing and intelligent. *See United States v. Brock*,

50 F.3d 762, 772 (6th Cir. 2007)(citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *Bray v. Cason*, 2008 WL 2544906, at *11 (E.D. Mich. June 20, 2008)(citing *Wheat v. United States*, 486 U.S. 153, 158-59 (1988)). A waiver is knowing and intelligent when made "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970)(footnote omitted). A criminal defendant also Whether there has been an intelligent waiver of a constitutional right depends on the facts and circumstances of the case. *Williams v. Jones*, 391 F.Supp.2d 603, 614 (E.D. Mich. 2005)(citing *Johnson v. Zerbst,* 304 U.S. at 464. In *United States v. Lowry,* 971 F.2d 55, 60 (7th Cir. 1992), the United States Court of Appeals for the Seventh Circuit noted the dilemma faced by a trial court confronted with a conflict of interest:

> If the court is alerted to a conflict of interest and disqualifies a defendant's attorney, the defendant may claim on appeal that he was deprived of the right to retain the counsel of his choice. If, on the other hand, the court accepts the defendant's waiver of his right to conflict-free counsel and allows him to proceed despite a conflict, the defendant may later claim that his waiver was invalid for some reason, and that an alleged conflict of interest rendered his counsel constitutionally ineffective....As the Supreme Court put it in *Wheat,* 'trial courts face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule.' 486 U.S. at 161, 108 S.Ct. at 1698.

*Id*. The Court in *Lowry* concluded the defendant had waived his right to conflict-free counsel, stating "To hold otherwise would be to render the waiver meaningless; a defendant would lose nothing by waiving his right and sticking with counsel who had a conflict, since he could always allege 'ineffective assistance' if convicted. *Id*. at 63-64. The United States Court of Appeals for the Sixth Circuit "has held that even where there is an actual conflict of interest, a court must accept a defendant's valid waiver of the conflict, absent compelling circumstances." *Bray v. Cason*, 2008 WL 2544906, at *12 (citing *United States v. Reese*, 699 F.2d at 805; *United States v. Guerrero*, 917

F.2d 564, 1990 WL 166414 (Table) (6th Cir.1990)).

Here, on January 13, 2005, after the prosecution had offered to reduce Petitioner's charges to a conviction on felonious assault if he testified against his co-defendant, the court held a hearing to determine whether new counsel was required. *Transcript,* January 13, 2005. The trial court advised Petitioner that he needed to consult with an independent attorney, since his attorney "was not only worried about you but he was worried about Mr. Robinson . . . and maybe he wasn't telling you what was best for you personally. . . maybe he was telling you what's best for the team ior for Shane Robinson and you're entitled to hear advice as to what's best for you without regard to what's good for Mr. Robinson." *Id*. at 5. The trial court advised Petitioner that he "never" would have appointed the same lawyer for two co-defendants and repeatedly urged Petitioner to get "advice from somebody who is concerned only about you." *Id.* at 6; 8-9. The prosecutor clarified that, if Petitioner rejected the plea offer, he could be convicted of both aggravated murder and felonious assault." *Id.* at 8. Petitioner indicated he understood. Defense counsel indicated he had discussed the issue with both of his clients. *Id*. at 11. When asked if he had any questions, the only issue raised by Petitioner was whether consulting a new attorney would affect the running of his speedy trial rights. *Id.,* at 12. Petitioner stated:

> See. . . I'm innocent. So. . . . I've been ready to go to trial because
> I'm innocent of this. I didn't do any of it. So, I don't want no deal.
> I don't want to plead out to anything that I didn't do nothing.

*Id.* The trial court again urged Petitioner to obtain a new attorney and offered to return to the discussion if he thought of any questions. *Id*. at 13-14. On January 26, 2005, at another pre-trial hearing, the court again inquired as to whether Petitioner had consulted with another attorney, and urged him to do so.

> COURT: . . . [S]o later on I don't want to hear you say or I don't want to hear your new lawyer say later on that Mr. Olivito did something he should not have done or didn't do something he should have done because he was worried about Shane Robinson. In other words, I'm giving you the heads up now if this is a problem I want it dealt with now. And I'm going to keep talking to you about this cause I don't want to hear it later.

*Id.* at 4. The court offered to appoint an attorney to consult with Petitioner free of cost. *Id.* at 6.

Petitioner refused. *Id.*

> COURT: I just want to make sure that you know that there are alternatives and you've picked the one you want and that's fine with me.
>
> MR. CARTER: Okay.
>
> COURT: Any questions you have?
>
> MR. CARTER: No, Sir.

*Id.* at 8. In view of the foregoing, the Magistrate Judge concludes that the record establishes that Petitioner waived his right to conflict-free counsel.

As to defense counsel's failure to request a severance of charges based on prejudicial evidence that Robinson had attempted to bribe prosecution witnesses and brandished a firearm, the state appellate court found that evidence of Robinson's bribery was rebuttal evidence not made known to counsel prior to trial and that evidence regarding the firearm was cumulative. Petitioner does not dispute these factual finding. The Magistrate Judge concludes that counsel cannot have performed in a constitutionally ineffective manner for failing to request a severance on the basis of evidence he had no reason to anticipate or on evidence that was merely cumulative. Additionally, because the state appellate court concluded that Robinson's hearsay statement by Birden was admissible as an excited utterance, Petitioner cannot establish the ineffective assistance of counsel

based on his attorney's failure to object. Similarly, the prosecutor's conduct of which Petitioner complains was either appropriate or did not prejudice Petitioner.

## CLAIM FIVE

In claim five, Petitioner asserts he was denied a fair trial due to juror impartiality when jurors discussed and considered information outside the record. The state appellate court rejected this claim as follows:

> Carter argues:
>
> "The trial court erred when it failed to declare a mistrial after the impartiality of the jury was compromised when jurors discussed and considered information outside the record in violation of the Appellant's Fifth Amendment right to be tried and convicted only on the evidence presented at trial and of record and his Sixth Amendment right to an impartial jury."
>
> Carter maintains that he was prejudiced by the fact that one juror, during the course of the trial, discovered he knew one of the defense witnesses and told the rest of the jury that he was afraid of retaliation if they returned a guilty verdict. Carter claims the trial court was obligated to question each juror regarding whether this information would influence their decision, which it did not do.
>
> In this case, a juror informed the trial court during deliberations that he was uncomfortable with the possibility of a guilty verdict since he knew a defense witness. The jury's note to the trial court stated:
>
> "Juror realized during the testimony that he was familiar with Blake Thompson. Blake resided at the same complex (apt) within the last year. Juror did not know his name. Juror feels uncomfortable with possibility of defendants receiving a guilty verdict. Blake does recognize Juror as he has spoken to him in Hallway."
>
> After receiving this note, the trial court spoke to the juror in question. He stated that he recognized "quite a few of the audience members" and was feeling "paranoid" about the possibility that he may be retaliated against if there was a guilty verdict. He stated that he voiced these concerns to the other jurors. However, when asked by the court whether he could put these concerns aside and decide the

case based on the available evidence, the juror stated that he could do so. After the trial court questioned the juror, defense counsel objected, claiming that he believed the jury was no longer competent to give a verdict.

"An accused is entitled to a trial before an impartial, unprejudiced, and unbiased jury." *State v. Daniels* (1993), 92 Ohio App.3d 473, 486. This right is guaranteed by both the Ohio and United States Constitutions. *State v. Jaryga,* 11th Dist. No.2003-L-023, 2005-Ohio-0352, at ¶ 72. A jury's verdict must be based solely on the evidence and argument presented in open court, not on any outside influence. *Patterson v. Colorado* (1907), 205 U.S. 454, 462; see also *Smith v. Phillips* (1982), 455 U.S. 209, 217 ("Due process [requires] a jury capable and willing to decide the case solely on the evidence before it.").

This and other district courts of appeals have, in the past, presumed prejudice when a criminal defendant has proven juror misconduct. See *State v. Hood* (1999), 132 Ohio App.3d 334, 338; *State v. Spencer* (1997), 118 Ohio App.3d 871, 873; *State v. King* (1983), 10 Ohio App.3d 161, 165. However, the Ohio Supreme Court specifically rejected a presumption of prejudice in this situation in *State v. Keith,* 79 Ohio St.3d 514, 526, 1997-Ohio-0367, when it "reaffirmed a long-standing rule that a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown." See also *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, at ¶ 42, 45 ("[T]he party complaining about juror misconduct must establish prejudice."). Thus, the party making a claim of juror misconduct must first prove misconduct and then prove that they were prejudiced by that misconduct. *Jargya* at ¶ 75.

Trial courts are given broad discretion when dealing with allegations of juror misconduct. *Keith* at 526-527. Thus, its decision when faced with such allegations must be reviewed for an abuse of discretion. *Id.* at 528. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

Carter argues that the juror was biased because he was concerned for his safety if the jury rendered guilty verdicts. However, "[a] juror's concerns for safety, standing alone, are not sufficient to warrant a new trial." *State v. Garcia,* 8th Dist. No. 79917, 2002-Ohio-4179, at

¶ 86. The party alleging juror misconduct must still prove bias. *Id.* Thus, the fact that a juror worked in a high-crime area and was afraid the defendant's family knew him did not prove that he was biased. *Id.* Likewise, the fact that jurors felt like they were followed when out to lunch and were concerned about the defendants' access to the personal information on the jury questionnaires did not prove bias. *Daniels* at 487.

In this case, Carter has not proven that any member of the jury was biased as a result of the juror in question's concerns. The juror in question told the judge that he could decide the case based on the fact presented at trial. Furthermore, his concerns, if they did influence him at all, would have made him more likely to find Carter not guilty, rather than guilty. We cannot conclude that the trial court abused its discretion when it overruled Carter's motion for a mistrial at this stage in the proceedings.

Finally, Carter suggests that the trial court should have conducted a more thorough investigation into juror bias by questioning each juror individually to see if the juror's concerns affected them in any way. However, "the scope of voir dire is within the discretion of the trial court and varies depending on the circumstances of each case." *State v. Williams,* 79 Ohio St.3d 1, 5, 1997-Ohio-0407. In this case, the trial court spoke to the juror in question about his concerns. He then told the jury as a whole that the matter had been dealt with. The trial court did not abuse its discretion by not questioning each juror, especially in the absence of a request to do so by the defense.
For these reasons, the arguments within Carter's first assignment of error are meritless.

*State v. Carter*, 2007 WL 1976666, at *2-4.

Under this substantive legal standard, the Magistrate Judge cannot conclude that the state appellate court's determination of this issue was unreasonable. The standards identified by the state court, while derived from Ohio decisions, are similar to the federal constitutional standards identified in *Sowell v. Collins.* The focus of both tests is, assuming that the prosecutor did engage in some questionable or even clearly prohibited misconduct,

how those actions affected the overall fairness of the trial, and the likelihood, or unlikelihood, that the remarks in question prejudiced the petitioner in light of the strength of the evidence that he committed the crimes charged.

The analysis begins with the prosecutor's statement, during closing argument, that defense witness Daphne Birden disobeyed a court order to come back to court on the last day of trial so that she could be recalled by the prosecutor. The state court of appeals acknowledged that this statement was improper because there was no evidence before the jury to support it. The Magistrate Judge will similarly presume the impropriety of this statement, and proceed to the next steps of the analysis mandated by *Bates v. Bell, supra.*

Once a court has found prosecutorial misconduct, it must be determined if that misconduct was intentional and prejudicial. The state court made no finding about whether this particular instance of misconduct was intentional, but it can reasonably be inferred that it was, because the prosecutor was clearly aware that the jury had not been privy to the conversation at sidebar concerning recalling Ms. Birden as a witness. Consequently, the key issue is whether the statement was prejudicial - or, in the context of reviewing a state court decision under the AEDPA's deferential standard, whether the state appellate court's determination that it was not prejudicial was an unreasonable application of federal law.

Factually, the state court found that there was other evidence introduced which called into question the credibility of Ms. Birden's testimony, and particularly whether it had been procured through bribery. As one of it's a rebuttal witnesses, the state called

James Wrenn. Mr. Wrenn testified that he knew both Daphne Birden and her sister Michelle Harris. He said that he had taken Ms. Birden to petitioner's apartment shortly before the trial and that both she and her sister disappeared into another room with petitioner. When he and Ms. Birden left, she had $470.00 in cash and commented that she "got paid good for doing this." (Trial transcript, Vol. VIII, at 1341). Ms. Birden's testimony, as a defense witness, was to the effect that she had seen Carl Williams in Chicago during the month of August, 2001, when the murder took place, and that her brother, whom Mr. Williams claimed to be with on the night of the murder, was also in Chicago rather than Steubenville at that time. As noted by the state court of appeals, Mr. Williams claimed to have been an eyewitness to the murder itself, and he testified for the prosecution. He was certainly a significant witness because of the other two people he was with that night, at least according to his testimony concerning his companions, one (Ms. Birden's brother) had died prior to trial, and the other could not be located. Evidence that he was not in Steubenville on the night in question would have been very helpful to the petitioner's case.

Notwithstanding the important nature of Ms. Birden's testimony, a reasonable jurist could have reached the conclusion that the prosecutor's attempt to discredit her by referring to her failure to attend court on the last day of the trial was not so prejudicial as to require reversal. First, it may well be that the comment by the trial judge to Ms. Birden to the effect that she would be recalled was heard by the jury, since it does not appear in the transcript as part of a sidebar conference. *See Trial Transcript*, Vol. VII, at 1236. Second, the evidence that she took money from Shane Robinson for her testimony - especially when

she also told the jury, under oath, that she had not seen him for many months prior to the trial - was far more devastating to her credibility than the comments about her failure to come back to be recalled as a witness. Thus, the remarks in question were not likely to deceive or mislead the jury on the issue of Ms. Birden's credibility. Third, Ms. Birden did not specifically state that she saw Petitioner in Chicago on the exact date at time in question; rather, her testimony was more general, consisting of a statement that she saw Petitioner "every day" while she was in Chicago and she was there in July and August, 2001. (*Trial transcript*, Vol. VII, at 1208). By contrast, Mr. Williams described the events of that night in great detail. Consequently, her testimony did not have a tremendous amount of probative value to begin with. Finally, she was not the sole witness to testify about Williams' or her brother's not having been in Steubenville in August of 2001; most of the defense witnesses said the same thing. An attack on her credibility was not the equivalent of an attack on the credibility of all of the witnesses who could not place Petitioner in Steubenville at the time of the murder, and did not deprive the defense of its ability to argue that he was not there. Given all of this, it is reasonable to conclude that this particular instance of misconduct was not "so egregious as to render the entire trial fundamentally unfair," *see Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979), and that the state court's determination to that effect is one to which a federal habeas corpus court must give due deference. As a result, this particular component of the prosecutorial misconduct claim does not provide a basis for granting relief.

Petitioner also claims that the prosecutor acted improperly in suggesting that Birden

had been bribed, and by calling Wrenn as a rebuttal witness to support that claim. The state court rejected this claim because evidence that a witness was paid for her testimony is relevant to credibility and there was nothing improper about the prosecutor's attempts to discredit her in that way, especially when Wrenn provided direct testimony about the bribe. Thus, the state court did not engage in any further analysis because it found no misconduct.

In his appellate brief, petitioner argued that the prosecutor acted improperly because he represented to the court that Mr. Wrenn actually saw Ms. Birden receive the money from petitioner, whereas he then testified that the money changed hands in another room and out of his sight. Regardless of how the prosecutor explained the relevance of the testimony to the trial judge - and his comment that "he saw it happen," Trial Transcript, Vol. VIII, at 1340, is not entirely clear as to exactly what it is that Mr. Wrenn saw - the testimony was clear concerning the extent of Mr. Wrenn's knowledge. His testimony was circumstantial evidence of the payment of a bribe, but it permitted the jury to draw an inference that the reason Ms. Birden came away from her meeting with petitioner with money in her hand was that she was being paid for her testimony. It was therefore not unreasonable for the state court of appeals to find that the prosecutor did no more than offer and comment upon admissible evidence to the effect that a bribe had been paid, and he did not act improperly in doing so.

The final instance of prosecutorial misconduct which petitioner alleges is, as the court of appeals characterized it, the claim that "much of the State's closing argument

consisted of a deliberate attempt to appeal to the jury's emotions, repeated interjection of the prosecutor's personal opinion, repeated references to facts outside the record, and denigration of defense counsel." *State v. Robinson*, 2007 WL 1976578, *13. The court acknowledged that the summation included some appeal to the jurors' emotions, particularly with reference to the loss suffered by the victim's family, but that such references were not excessive. The court also viewed the prosecutor's references to petitioner and his co-defendant as drug dealers and killers as argument from evidence in the record, as opposed to statements made on the basis of evidence that only the prosecutor might have been aware of, and it rejected his claim that defense counsel was unduly denigrated in closing argument concerning the alleged bribery of witnesses because the prosecutor "did not infer that counsel knew or approved of the alleged bribes." *Id*. at *15.

Again, the Magistrate Judge is mindful that under the AEDPA, the state court's conclusion that the closing argument, taken as a whole, was not improper in any of these respects is to be given deference, and a federal habeas corpus court may not substitute its judgment for that of the state court unless the state court unreasonably applied controlling federal law in reaching its conclusion. The Magistrate Judge has reviewed the entire closing argument, *see* Trial Transcript, Vol. VIII, and cannot find the state court's decision to be unreasonable. There were only two brief references to the impact that the murder had on the victim's family at the beginning of the argument, and petitioner's counsel did not object to them. The reference to the defendants as drug dealers was at least somewhat grounded in the evidence that the killing was done as revenge for a drug-related robbery.

Further, that comment was a very small part of a long closing argument that focused mainly on the evidence and the credibility of the witnesses. The Magistrate Judge also concludes that there was no effort made to suggest, nor would the jury likely have inferred, that defense counsel was in any way involved in the alleged payments to witnesses. Using the appropriate standard from *Bates v. Bell*, the Magistrate Judge cannot find that any of these statements -even if the ones relating to the victim's family were marginally improper - were flagrant or pervasive, nor were they unduly prejudicial. The jury was properly asked, for the most part, to decide the case based on the evidence and not on improper factors such as sympathy or prejudice.     The Supreme Court has made it clear that improper comments during argument cannot be taken in isolation, but "must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young* 470 U.S. 1, 11 (1985). Viewing these isolated remarks by the prosecutor in the context of the entire trial, it is not unreasonable to conclude that they had little or no effect on the fairness of the trial, and certainly not enough to require reversal. Consequently, the Magistrate Judge finds no merit in any of petitioner's claims of prosecutorial misconduct.

For the reasons set out above, it is RECOMMENDED that the petition for writ of habeas corpus be DENIED.

If any party objects to this Report and Recommendation, that party may, within fourten (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection

thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk of Court is DIRECTED to mail a copy of the complaint and this Report and Recommendation to each defendant.


s/Mark R. Abel
United States Magistrate Judge